CSX TRANSPORTATION, INC., and National Railroad Passenger Corporation (AMTRAK), Plaintiffs,

v.

CITY OF GARDEN CITY, GEORGIA, Defendant/Third Party Plaintiff,

v.

Arco, Inc., Third Party Defendant.

No. 498 CV 233.

United States District Court,
S.D. Georgia,
Savannah Division.

March 30, 2005.

Amy R. Snell, Fulcher Law Firm, James W. Purcell, Fulcher, Hagler, LLP, Augusta, GA, L. Dean Best, Haynsworth, Sinkler & Boyd, PA, Charleston, SC, for CSX Transportation, Inc., and National Railroad Passenger Corporation.

Christopher L. Ray, James Philip Gerard, Patrick T. O'Connor, Paul Hughes Threlkeld, Oliver, Maner & Gray, LLP, Savannah, GA, for The City of Garden City.

Edward R. Stabell, III, Brennan, Harris & Rominger, Savannah, GA, Anthony M. Iannacio, H. Hamilton Rice, III, Keith M. Carter, Stephen F. Myers, Shackleford, Farrior, Stallings & Evans, PA, Tampa, FL, Richard A. Rominger, Brennan, Harris & Rominger, Savannah, GA, for Arco Inc.

## ORDER

EDENFIELD, District Judge.

### I. BACKGROUND

On second remand from the Eleventh Circuit, *CSX Transp., Inc. v. City of Garden City*, 355 F.3d 1295, 1297 (11th Cir. 2004) ("*CSX V*"), this Court must determine the enforceability of a municipality's indemnification promise to a private party. Doc. # 119 at 1. As previously noted, *id.*, murky legal issues arise from the following factual background:

> In 1996 [defendant] Garden City[, Georgia (the City)] entered into a series of agreements with [plaintiffs] CSX Transportation Inc. and its affiliates to utilize a railroad right-of-way to install water and sewer lines.[1] The agreements required Garden City to indemnify and hold harmless CSX or its subsidiaries for all liabilities CSX suffered in connection with the project and for which CSX was not the sole cause. The agreements also required Garden City to maintain insurance covering the indemnity obligations the City had assumed. In [10/97,] a passenger train collided with a tractor trailer operated by Garden City's subcontractor causing CSX to incur substantial property damage and subjecting CSX to third-party claims.[2] CSX

---

1. To accomplish that task, the "City employed ARCO, Inc. as the general contractor for this project which employed CARLCO Trucking, Inc. as a sub-contractor." *CSX Transp., Inc.*

*v. City of Garden City*, 235 F.3d 1325, 1326–27 (11th Cir.2000) ("*CSX I*").

2. "On [10/9/97] a CARLCO employee drove a tractor-trailer truck to the City's work site to

sought indemnification from Garden City in accordance with the agreements. Garden City refused and CSX[3] brought suit alleging that it was entitled to indemnification. [This C]ourt granted summary judgment to the City, finding that the indemnification provision constituted an impermissible waiver of the City's sovereign immunity in the absence of any evidence that the City had liability insurance to cover the indemnity claim. The Eleventh Circuit reversed and remanded to [this C]ourt for its consideration of the effect of the City's participation in the Georgia Interlocal Risk Management Agency (GIRMA), a multi-government insurance fund. On remand, [this C]ourt again granted summary judgment to the City, [*CSX Transp., Inc. v. City of Garden City, Georgia*, 196 F.Supp.2d 1288, 1297 (S.D.Ga.2002) ("*CSX II*")], finding that the indemnification agreements were ultra vires and that O.C.G.A. § 36–33–1(a) did not authorize the City to waive its immunity by entering into an indemnity contract.

*CSX Transp., Inc. v. City of Garden City*, 277 Ga. 248, 248–49, 588 S.E.2d 688 (2003) ("*CSX IV*") (footnotes added). CSX again appealed to the Eleventh Circuit, which then certified two questions to the Georgia Supreme Court:

1. May a Georgia municipality contractually indemnify a private party for any and all loss, damage, and liability arising in connection with a public works project involving the private party's land?

2. If not, is there any loss, damage, or liability arising in connection with a

public works project involving a private party's land for which a Georgia municipality may contractually indemnify the private party?

*CSX V*, 355 F.3d at 1296. In *CSX IV* "Division 1," the Georgia Supreme Court purported to answer both questions in the negative. *Id.* But in "Division 2" of that opinion, that court seemed to qualify its response by noting that,

[a]lthough the [CSX–City] indemnification provision itself is void, and does not, therefore, effectuate a waiver of the City's sovereign immunity, CSX contends that sovereign immunity was waived by the City's participation in GIRMA. Under the plain terms of OCGA § 36–33–1, if a municipality purchases liability insurance sovereign immunity is waived only as to those occurrences for which sovereign immunity would apply. We have held that the purchase of a GIRMA coverage agreement as authorized by OCGA §§ 36–85–1 to 36–85–20 constitutes the purchase of liability insurance. Thus, if the facts behind CSX's cause of action against the City fall within the scope of coverage provided by the GIRMA policy and sovereign immunity would otherwise apply to that cause of action, the City's sovereign immunity is waived to the extent of such liability coverage.

*CSX IV*, 277 Ga. at 250–51, 588 S.E.2d 688 (cite omitted). As will be explained *infra*, these two Divisions, read together, may support CSX's argument that the *CSX IV* court in many respects answered the Certified questions *in the affirmative*.

---

remove equipment. As he crossed CSX's tracks, his truck stalled on the tracks where it was hit by a[n Amtrak] passenger train. CSX paid damages to passengers on the train and sued Garden City for indemnification under their agreement. Garden City filed a third-party claim against its contractor, ARCO." *CSX I*, 235 F.3d at 1326–27.

3. There are two plaintiffs in this case: CSX Transportation, Inc., which owns the train track on which the accident occurred, and National Railroad Passenger Corporation (Amtrak), which owns the wrecked train. For convenience, however, the Court hereafter will refer to "CSX" as if it were the only plaintiff.

In any event, the *CSX IV* decision led the Eleventh Circuit to conclude that "Georgia municipalities may never waive their sovereign immunity by, for example, contracting to indemnify third parties, *without* (1) express legislative authority or (2) satisfying the requirements of [O.C.G.A.] § 36–33–1(a)." *CSX V*, 355 F.3d at 1297. While it is now clear that the City cannot contractually waive its own sovereign immunity, it is not clear whether the City can otherwise contractually indemnify a private party under the circumstances presented here.

In the meantime, the Eleventh Circuit has remanded the case to this Court because *if:* (a) the City purchased GIRMA coverage as authorized by O.C.G.A. §§ 36–85–1 to 36–85–20; (b) the facts behind CSX's cause of action against the City fall within the scope of that coverage; and (c) sovereign immunity would otherwise apply to that cause of action, *then* the City's sovereign immunity is waived to the extent the terms of the liability policy cover same. *CSX IV*, 277 Ga. at 250–51, 588 S.E.2d 688; *CSX V*, 355 F.3d at 1297.

 Unsurprisingly, more questions have since surfaced. Doc. # 119 at 2–8. For starters, CSX has the burden to show that the City waived its sovereign immunity by purchasing insurance to cover CSX's claims. *See Smith v. Chatham County,* 264 Ga.App. 566, 567–68 (2003) (sovereign immunity waiver must be established by the party seeking to benefit from it). It thus seeks to demonstrate how the GIRMA policy covers its train-wreck damages. But GIRMA, the only party CSX says would ultimately pay any judgment entered here, *see* doc. # 112 at 19, is not a party to this case.

And, in pursuing only "partial" summary judgment, CSX has expressly limited its request for relief to a mere declaration that the GIRMA policy covers its claims and thus the City has waived its sovereign

immunity. Doc. # 112 at 6 ("the issue at this juncture is whether Garden City has waived its sovereign immunity by purchasing GIRMA insurance").

This led the Court to question whether (a) CSX seeks an advisory opinion; (b) GIRMA is an indispensable party; and (c) CSX expects the City to pay if GIRMA does not—and if CSX has no such expectation, what more does it want from the City? The Court thus requested further briefing. Doc. # 119 at 8–9. Both CSX and Garden City have complied via summary judgment motions. Doc. ## 122, 126. And ARCO renews its prior summary judgment motion. Doc. # 138.

## II. ANALYSIS

### A. CSX's Summary Judgment Motion

CSX now clarifies that

[a]fter exhaustive and comprehensive review on this thorny legal issue ... the nature of [CSX's] action against Garden City is a direct action for a damage award that will be satisfied from the insurance proceeds available under the [C]ity's GIRMA policy, up to the limits of the policy. If GIRMA refuses to satisfy the judgment, [CSX] can enforce the judgment by filing an action against GIRMA, but [CSX] cannot sue GIRMA directly under it [until] after it receive[s] a judgment against the [C]ity.

Doc. # 128 at 2. CSX then provides much discussion on the procedural mechanics by which it in effect would sue the City but collect only from GIRMA. *Id.* at 4–25, 591 S.E.2d 388.

Boiled down, CSX reads *CSX IV* "Division 2" as placing (through its indemnification promise) the City in CSX's shoes in terms of absorbing CSX's train-wreck losses—but only to the extent that GIRMA will pay out on those claims. CSX thus

need only show how its claims are covered by the GIRMA policy, then obtain judgment against the City, to be paid by GIRMA. Doc. # 128 at 12–13, 24.

CSX cites two GIRMA policy provisions to show that the facts behind its claims fit within the GIRMA policy. Doc. # 128 at 10; # 96 at 8, 9; # 112 at 9. It also cites policy language barring a direct action against GIRMA until a judgment is first obtained against the City. Doc # 128 at 10–11 (citing doc. # 97 exh. B at 7 ¶ 1(A)). Thus, it concludes, it can recover a judgment against the City up to the policy's coverage limits, and GIRMA need not be a party to this action. *Id.* at 11, 24.

Disagreeing, the City argues, *inter alia*, that the indemnification contract claim against the City has specifically been found void by the *CSX IV* court, so there is no basis for holding the City liable and thus no need for this Court to determine if the facts behind CSX's claim fit within the GIRMA policy. Doc. # 124 at 5; # 135 at 3 (hereafter, the City's "first ultra vires argument"). It also argues that the indemnification agreement is "void under O.C.G.A. § 36–30–3(a) as ... preventing free legislation and also ... creating unlawful public debt." Doc. # 135 at 4 (hereafter, the "second ultra vires argument").

### B. Sovereign Immunity and Ultra Vires Defenses

This case is hard to follow because the courts have analyzed the CSX–City indemnification contract under both tort and contract doctrines. That has led the courts to navigate between sovereign immunity and ultra vires defenses, sometimes confusingly enmeshing the two. Some clarification therefore is warranted here.

■ First, a promise to indemnify another for his own losses, and for tort claims raised against him, is just that: a promise. A breach of that indemnification promise supports a *contract* (not a tort) action.[4] Citing the indemnification contract, CSX complains that the City has refused to indemnify it for its own property damages plus what it has paid to those who sued it in tort. Doc. # 1 at 5.

CSX does not allege that the City breached any tort duty, or any other private right other than the breach of the CSX–City indemnification agreement. *See Alverson v. Employees' Retirement System of Georgia,* 272 Ga.App. 389, 613 S.E.2d 119, 2005 WL 503152 at * 2 (2005) (distinguishing tort from contract claims based on the duty breached); *CSX III,* 325 F.3d at 1241 n. 6 ("CSX, Garden City, and the district court all agree that CSX's claim does not sound in tort, which clearly would involve the doctrine of sovereign immunity, but, rather, in contract"). CSX thus advances, both in form and substance, a contract claim.

■ Second, cities do *not* have a sovereign immunity defense to contract claims. *City of Atlanta v. Atlantic Realty Co.,* 205 Ga.App. 1, 3, 421 S.E.2d 113 (1992) ("The doctrine of sovereign immunity is available to a municipality against claims based on negligence. The defense is not applicable to claims against a municipality which are

---

**4.** "Georgia law continues to recognize two broad categories of indemnity: as created by contract, as between a surety and a debtor; and under the common law of vicarious liability, as between principals and agents." *City of College Park v. Fortenberry,* 271 Ga.App. 446, 609 S.E.2d 763, 2005 WL 171825 at * 4 (2005); *J.C. Penney Co. v. Malouf Co.,* 230 Ga. 140, 143, 196 S.E.2d 145 (1973); 41 Am.

Jur.2d *Indemnity* § 2 (May 2004) ("Indemnity may be based on an express or implied *contract* to indemnify, or on equitable concepts arising from the *tort* theory of indemnity") (emphasis added). CSX advances only a contractual indemnity claim. Doc. # 1 at 5 ("Facts and Claim for Contractual Indemnity").

contractual in nature"); *Precise v. Rossville*, 261 Ga. 210, 211, 403 S.E.2d 47 (1991) ("State law relating to the sovereign immunity of municipalities is codified in OCGA § 36–33–1 *et seq.* Although the doctrine of municipal immunity has been codified since 1895, we have never construed it as a defense to action for the breach of a valid contract. To the contrary, we have repeatedly enforced valid contracts against municipalities"); 13 GA. JUR. PERSONAL INJURY AND TORTS § 9:67 (Oct.2004) ("Sovereign immunity does not bar a breach of contract action against a municipal corporation").

Cities thus invoke sovereign immunity (also called "municipal immunity") exclusively against *tort* claims. *Barton v. City of Rome*, 271 Ga.App. 858, 610 S.E.2d 566, 2005 WL 293667 at * 3 n. 2 (2005); *City of Columbus v. Barngrover*, 250 Ga.App. 589, 599, 552 S.E.2d 536 (2001); *see also Banks*

*v. Happoldt*, 271 Ga.App. 146, 608 S.E.2d 741, 743–44 (2004) (counties too).

■ In contrast, cities can defend contract claims by claiming they lacked authority to enter into the contract. *See H.G. Brown Family Ltd. Partnership v. City of Villa Rica*, 278 Ga. 819, 820, 607 S.E.2d 883 (2005) ("if a local government enters a contract in abrogation of its delegated power or in excess of its authority to enter contracts, then the contract is deemed ultra vires and void").

. ■■ So if a city is not authorized by law to contractually indemnify a private party,[5] a contract doing so should be deemed ultra vires and sovereign immunity should not be in issue. And if it is ultra vires, then pointing to insurance to back it should not make it any less so.

Third, a city's sovereign immunity against *some* tort claims may be waived, though it is usually linked to non-taxpayer

---

**5.** Cities have implied power to contract for goods and services to support ordinary municipal functions like street lights, *see generally* 10 McQUILLIN MUN. CORP. § 29.05.10 (3rd ed. July 2004), but contracts beyond that realm face "political" and "time" restrictions. *See Greene County School Dist. v. Greene County*, 278 Ga. 849, 850, 607 S.E.2d 881 (2005) (Generally, a municipal government may not enter into a contract that lasts longer than that government's term of office because one council may not, by an ordinance, bind itself or its successors so as to prevent free legislation in the matters of municipal government); *Patterson v. City Council of Sparta*, 175 Ga. App. 819, 820, 334 S.E.2d 725 (1985) ("Municipal corporations may not legally make contracts which give away control or embarrass their legislative or governmental powers"); *Barr v. City Council of Augusta*, 206 Ga. 750, 750, 58 S.E.2d 820 (1950) (A municipal corporation has no power to make contracts restricting or limiting its legislative or governmental powers).

They also face "structural" restrictions. *See Barrett v. City of Atlanta*, 145 Ga. 678, 679, 89 S.E. 781 (1916) (A municipal corporation has no power to contract or incur liabili-

ty not authorized by its charter, or some joint law of the state, and a contract not so authorized is void), cited in *CSX III*, 325 F.3d at 1240; *see also* 10A McQUILLIN § 29.91 (3rd ed. July 2004); GA. CONST. 1983 ART. 9 § 2 ¶ 2; O.C.G.A. §§ 36–30–3, 36–34–1 *et seq.*

Here the City argues both. It says that the CSX–City agreement violates GA. CONST. 1983 ART. 9 § 5 ¶ 1, by creating an unlawful public debt. Doc. # 124 at 5; *see Unified Government of Athens Clarke County v. North*, 250 Ga.App. 432, 436–37, 551 S.E.2d 798 (2001) (O.C.G.A. § 36–60–13, providing that a city or county multi-year purchase contract for goods or services must be subject to annual termination by the city or county, is intended to prohibit the creation of a county or municipal debt in excess of one year). And, it says, the agreement violates O.C.G.A. § 36–30–3(a)'s ban against city officials entering into contracts that obligate the city beyond the officials' term of office. *Id.; see also* doc. # 135 at 4. The *CSX III* court certified these "term-of-office" (also referenced as "free legislation") and "public debt" arguments, *CSX III*, 325 F.3d at 1245–46, but the *CSX IV* court declined to reach either in light of its holding. 277 Ga. at 251, 588 S.E.2d 688.

funding sources like insurance for payment of any liability judgment. *Riggins v. City of St. Marys*, 264 Ga.App. 95, 101, 589 S.E.2d 691 (2003). In that respect, Georgia has a somewhat confusing sovereign immunity waiver statute. Under O.C.G.A. § 36–33–1(a), municipalities do *not* waive their general sovereign immunity to tort claims merely by purchasing insurance

> *except* as provided in O.C.G.A. § 33–24–51 or 36–92–2 [neither of which are claimed to be applicable here], *or* unless the policy of insurance covers an *occurrence* for which the defense of sovereign immunity *is* available, and then only to the extent of the limits of such policy.

O.C.G.A. § 36–33–1(a) (emphasis added).

Some municipal torts receive no sovereign immunity protection at all. *See Hibbs v. City of Riverdale*, 267 Ga. 337, 337, 478 S.E.2d 121 (1996) (nuisance); O.C.G.A. § 36–33–1(b) (a municipality can be held liable for negligently performing a ministerial duty). No immunity obviously means there is nothing to waive, thus rendering any insurance irrelevant on that score. *See CSX III*, 325 F.3d at 1243 n. 11.

■ So when courts apply § 36–33–1(a), they are analyzing a tort claim that fits within a given insurance policy *and* falls into a specific class of torts (hereafter referenced as "sovereign immunity torts" or "SI torts")—torts that a city typically commits in the performance of a governmental, not ministerial, function. *See CSX III*, 325 F.3d at 1243 n. 10.

■■ Finally, only the Georgia legislature, not a city, can waive a city's sovereign immunity from torts by non-insurance methods. *CSX IV*, 277 Ga. at 250, 588 S.E.2d 688 (the City could not directly pay

indemnification for SI torts from its own coffers).[6] It follows that a city cannot do indirectly—contractually waive its own sovereign immunity from torts—what it could not otherwise do directly by enacting a resolution, ordinance, etc. *Id.*

To summarize, a municipality can defend against a contract claim by invoking the ultra vires, but *not* the sovereign immunity, defense. In contrast, it can defend against a specific "SI" class of tort claims by invoking sovereign immunity, as codified in O.C.G.A. § 36–33–1. *Precise*, 261 Ga. at 211, 403 S.E.2d 47. That immunity may be waived by a city if it is authorized to do so and non-taxpayer funding (like insurance) covers it.

## C. The CSX–City Indemnity Contract

As the Eleventh Circuit's *CSX III* decision comprehensively explained, the CSX–City contract requires the City to pay CSX for all losses arising from the City's construction project, except those caused by CSX itself, whether *or not* caused by the City's own negligence. *CSX III*, 325 F.3d at 1240–43; *see also* doc. #97 exh. A ¶¶ 9.1–9.6. The contract thus relieves CSX of having to sue the City in tort even if it could be said that the City engaged in a tort that caused some or all of CSX's damages (*i.e.*, a tort for which sovereign immunity is "available," to use the *CSX III* court's word, or—to use this Court's term—an SI tort).

■ As for torts caused by the City, then, the parties may be said to have attempted to contractually eliminate the City's sovereign immunity, at least for torts to which that defense applies (*i.e.*, SI

---

**6.** *See also Seaboard Air Line R. Co. v. County of Crisp of State of Georgia*, 280 F.2d 873, 877–78 (5th Cir.1960) (Georgia law) (upholding county's *indemnity contract* to protect railroad embankment from injury from county dam operation; specific state constitutional amendment authorized county to build a hydroelectric power plant and contract to do so, and a statute imposed liability on county for damages; general tax revenues were not at risk because plant's revenue stream could be tapped for liability judgments).

torts). As the *CSX IV* court just held, the City cannot do that because § 36–33–1 does not authorize that result. 277 Ga. at 250, 588 S.E.2d 688. That is, a city cannot do indirectly (contractually waive its own sovereign immunity from SI torts) what it could not otherwise do directly by enacting a resolution, ordinance, etc. *Id.; see also H.G. Brown*, 278 Ga. at 820, 607 S.E.2d 883. The *CSX IV* court then suggested that by purchasing insurance, however, it could be done. 277 Ga. at 250–51, 588 S.E.2d 688.

But that does not resolve the City's liability under the contract for torts caused by others,[7] and this Court is unable to discern whether *CSX IV* applies to that extent. As explained in Part II(B) *supra*, a city cannot contractually waive sovereign immunity for its own (hence, SI) torts, but here the contract requires the City to indemnify CSX for *another's* torts.

Also, while it is unclear whether CSX is advancing it as an issue now, the *CSX IV* analysis also does not speak to whether the City can be contractually liable to pay for any torts caused by the City, but (*e.g.*, ministerial acts) for which sovereign immunity is not available (*i.e.*, non-sovereign immunity, "non-SI" torts). *See supra* n. 7.

All of these potential issues were illuminated by the *CSX III* panel. *CSX III*, 325 F.3d at 1240–44. After reviewing the *CSX III* analysis and corresponding questions (aimed at resolving unclear Georgia law), it appears that the *CSX IV* court failed to respond to these issues, which still confront this Court on remand. The *CSX III* court noted that if a city purchases liability insurance, O.C.G.A. § 36–33–1(a) waives that city's sovereign immunity, but only for those torts for which the sovereign immunity defense would be "available" (*i.e.*, SI torts). *CSX III*, 325 F.3d at 1243. It underscored what sorts of torts fall within and without that category. *CSX III* 325 F.3d at 1243 n. 10. After detailing those distinctions, it emphasized that

> [i]ndemnifying a private party for [non-SI torts] does not appear to waive sovereign immunity, since it would not be available in the first place and, therefore, would not be prohibited by § 36–33–1(a). However, the Georgia law on that point is not entirely clear.

*CSX III*, 325 F.3d at 1243 n. 11. In other words, there may be no need to even consider § 36–33–1(a) [8] since it may not apply to the CSX–City indemnification contract (at least to that portion that covers non-SI torts) in the first place.

Next, the *CSX III* court "suppos[ed] that the indemnity provision here does *not*

---

7. The *CSX IV* court stated that "the principal issue .... is whether Garden City was authorized to enter into an indemnification agreement with a private third party, thereby waiving *its* sovereign immunity." 277 Ga. at 249, 588 S.E.2d 688 (emphasis added). It did not address the indemnification agreement with respect to claims not covered by sovereign immunity. Yet the contract requires the City to indemnify CSX for "any and all liability, loss, damage" caused by "the negligence of *others* for which the [City] would *not* otherwise be liable." *CSX III*, 325 F.3d at 1242 (emphasis added).

8. O.C.G.A. § 36–33–1(a) is extremely unclear on this point. The statute says cities may

waive sovereign immunity only when the defense of sovereign immunity applies. But when else would the issue come up? It thus seems extraneous to say that sovereign immunity is waived *only if sovereign immunity is available*. The statute is irrelevant when sovereign immunity does not apply and in that situation there would be nothing to waive anyway. The statute's limitation, then, seems meaningless. Perhaps the legislature simply wanted to emphasize that when sovereign immunity protects a city from a particular form of tort liability, the city can waive that protection only to the *extent* of the insurance coverage and not beyond. Hence, a city should never have to pay out of its coffers on those claims.

constitute an impermissible waiver of Garden City's sovereign immunity," in which case that court "consider[ed] other possible grounds under state law that might bar the City's indemnification of private parties." 325 F.3d at 1244 (emphasis added). It thus asked whether the contract is void on ultra vires grounds in that it creates both an unlawfully lengthy obligation and an unlawful public debt—grounds now re-raised here, in the City's second ultra vires argument.

Finally, that court asked, what if the contract is ultra vires simply because there was no express or implied authority for the City to enter into it in the first place? *Id.* at 1246. Unable (due to the lack of clarity in Georgia law) to answer any of those questions, it likewise sought answers for them, too. *Id.* at 1246–49.

Perhaps due to the confusion underscored in Part II(B) of this opinion, the *CSX IV* court answered virtually none of those questions. Instead, it viewed "the principal issue ... [a]s whether Garden City was authorized to enter into an indemnification agreement with a private third party, thereby waiving its sovereign immunity." *CSX IV*, 277 Ga. at 249, 588 S.E.2d 688. It thus did not address whether sovereign immunity even applied to the circumstances contemplated in the CSX–City indemnification contract in the first place, and if so, to which (SI versus non-SI) tort claims.

Its "principal issue," then, addressed *only* whether the City could contractually waive its sovereign immunity for torts *the City caused*, and for which the sovereign immunity defense would otherwise have been "available" (SI torts). Thus, it did not recognize that the indemnity contract also covered non-SI torts-torts for which that defense was *not* available (*i.e.*, ministerial act, others' torts, etc.). On the "principal issue" it held that,

> [b]ecause nothing in OCGA § 36–33–1 can be construed to permit a municipality to waive its sovereign immunity by contracting to indemnify a third party, the indemnification agreement between the City and CSX is void as an ultra vires contract.

*CSX IV*, 277 Ga. at 250, 588 S.E.2d 688. This tracks the concept that a city cannot do indirectly (by contract) what it is prohibited from doing directly (waiving its own sovereign immunity). That much seems clear.

But in response to CSX's contention "that sovereign immunity was waived by the City's participation in GIRMA," the *CSX IV* court noted § 36–33–1(a) (purchase of insurance) as an alternative method to waive sovereign immunity. *Id.* at 250, 588 S.E.2d 688. It thus noted that, if the facts behind CSX's cause of action fall within the scope of the City's GIRMA policy, then the City's sovereign immunity is waived to the extent of such liability coverage, and presumably CSX may recover on those claims to the extent of that coverage. *Id.* at 251, 588 S.E.2d 688.

*CSX IV* thus seems to say that while the indemnity contract may not alone create liability for the City for its SI torts, it may do so if insurance coverage waives the sovereign immunity bar.[9] But that read-

---

9. The City reads *CSX IV* Division 2 to mean that CSX's *indemnity* claims are completely barred, but sovereign immunity may be waived for CSX's *tort* claims. But CSX has never asserted any tort claims, and the Eleventh Circuit did not certify any questions concerning tort claims. Moreover, the indemnity agreement was found to be void only because

it attempted to waive sovereign immunity. Thus, because the presence of insurance coverage moots the *CSX IV* court's reason for finding the indemnity agreement ultra vires (*i.e.*, the indemnity agreement need not *impermissibly* waive sovereign immunity if insurance coverage *permissibly* does so), and because the *CSX IV* could not have been re-

ing is not entirely clear. The City, for example, cites *CSX IV* to insist that the contract is "ultra vires and unenforceable against the City," so this Court should not, by accepting CSX's GIRMA coverage argument, "authorize a circumvention of [the *CSX IV* court's] decision." Doc. # 124 at 3. The City's interpretation of *CSX IV* is plausible if that opinion means that the contract is void in all respects. *See infra* n. 11. Under this view, CSX must recast its claim as an SI tort claim and argue that it fits within the City's GIRMA policy (the City presumably would then invoke its independent contractor defense, *see* doc. # 99 at 7–8).

The only clear statement from the *CSX IV* holding, then, is that a city cannot do by contract what it could not otherwise do by ordinance or some other legislative act: waive, without insurance, its sovereign immunity for torts. That court then suggested that waiver could be accomplished with insurance (hence, this remand).

But as for non-SI torts, where the contract was not attempting to impermissibly waive sovereign immunity, the *CSX IV* court simply failed to say whether the indemnification is prohibited. It thus left CSX free to argue here that (a) the City is contractually liable for CSX's non-SI tort

expenses; and (b) insurance coverage for those claims is a matter the City must privately resolve with its insurer.[10]

The *CSX IV* court purported to address the rest of the *CSX III* issues by confusingly explaining that

the indemnification agreement between CSX and the City has *no effect* on the issue of the City's waiver of immunity both because it is void and because under OCGA § 36–33–1(a) it is the purchase of insurance that effectuates the waiver of sovereign immunity. *It is irrelevant that the invalid indemnification agreement covered occurrences to which sovereign immunity both did and did not apply.* Under Georgia law, sovereign immunity may be waived only by an act of the legislature and the legislature has provided that municipal sovereign immunity may be waived only by the purchase of liability insurance if the "policy of insurance issued covers an occurrence for which the defense of sovereign immunity is available, and then only to the extent of the limits of such insurance policy." OCGA § 36–33–1(a).

*Id.* at 251, 588 S.E.2d 688 (emphasis added). Here the *CSX IV* court persisted in restricting its focus to whether the City

---

ferring to any *tort* claims alleged herein, this Court cannot accept the City's strained reading of *CSX IV*. *See also infra* n. 11 (also discussing the extent that the indemnity agreement was held ultra vires).

**10.** In *private* tort cases where A sues B over an accident B caused, A typically does not sue B's insurer directly. Instead, B and his insurer privately resolve coverage issues. And if B and his insurer disagree, then his insurer either serves B with a reservation of rights letter or brings a separate declaratory judgment action, claiming no coverage. *See, e.g., Harden v. State Farm Fire & Cas. Co.*, 269 Ga.App. 732, 732, 605 S.E.2d 37 (2004); *Vara v. Essex Ins. Co.*, 269 Ga.App. 417, 418, 604 S.E.2d 260 (2004). Under this scenario, the insurer is not sued directly, much less made

an indispensable party in A's case against B. Hence, GIRMA would not be an indispensable party here.

Contrast that with a *public*, SI-tort case, where X sues Y, a municipality. If sovereign immunity applies, X must show that: (1) Y has waived its sovereign immunity by purchasing insurance to cover any resulting judgment against it; (2) the Georgia legislature expressly authorized Y to waive immunity for such claims; and (3) the insurance policy in fact covers those claims. *CSX IV*, 277 Ga. at 251, 588 S.E.2d 688; *CSX II*, 196 F.Supp.2d at 1293–94. Georgia law remains unclear on how—in terms of procedure—public tort insurance coverage is resolved, since it will be the insurer, and not the City, who pays for any liability judgment on SI torts.

could contractually waive its sovereign immunity for torts that fit under § 36–33–1(a) (*i.e.*, SI torts). It then insisted that it does not matter whether the contract covered non-SI torts because, under the narrow view that court took of the case (*i.e.*, whether a municipality could contractually waive sovereign immunity from SI torts and thus expose its coffers to a liability judgment), the instant contract was void because it impermissibly sought to waive sovereign immunity. So viewed strictly as a sovereign immunity waiver case, whatever else the agreement may have covered was "irrelevant." [11]

Hence, the *CSX IV* court never did pass on whether the City had authority to contractually indemnify CSX for non-SI torts (including those committed by *others*).[12] Turning, then, to the City's "first ultra vires" argument—that the *CSX IV* court declared the whole contract void so there is no need to determine whether the facts behind CSX's claim fit within the GIRMA policy—the Court disagrees. While the City cannot be held *directly* liable for SI torts under the indemnity agreement (*i.e.*, payment may not come from City coffers), the Court interprets

*CSX IV* to say that the contract is void *only to the extent it seeks to waive sovereign immunity.*

But to the extent that the *GIRMA insurance* waives the City's sovereign immunity (as codified by § 36–33–1(a)), the indemnity agreement need not do so, and the indemnity contract is therefore valid under *CSX IV*.[13] And to the extent sovereign immunity is not available (non-SI torts), the contract's coverage of those claims has *not* been invalidated by *CSX IV* (indeed, that court never passed on the issue).

Of course, the indemnity contract could still be void on other ultra vires grounds. That brings the Court to the City's second ultra vires (free legislation, unlawful debt) argument, and resurrects the *CSX III* panel's still-unanswered question as to whether the entire contract is ultra vires for want of implied or express authority. *CSX III*, 325 F.3d at 1246–49. As mentioned *supra*, no court has passed on these arguments.

That question is addressed in note 5 *supra*. The "unlawful debt" and "free legislation" doctrines guard against (a) pres-

---

**11.** The City reads the cited passage to mean that, since part of the contract is void, so is the rest. This argument is not frivolous but nevertheless unconvincing given the *CSX IV* court's failure to clearly say so, and the City's failure to cite any authority beyond the *CSX IV* opinion in support of this legal premise. In addition, the City does not explain away the contract's severability clause. *See CSX III*, 325 F.3d at 1243 n. 12; *see also* 17A C.J.S. *Contracts* § 350 (June 2004) ("a contract may, both in its nature and its terms, be severable and yet rendered entire by the intention of the parties....").

Finally, not every ultra vires flaw fatally taints the remainder of a municipal contract. *See Screws v. City of Atlanta*, 189 Ga. 839, 844, 8 S.E.2d 16 (1940) (holding that one contractual provision "was ultra vires and void," but that "[t]he other portions of the contract are not attacked in this suit, and are

assumed to be valid"); *Grove v. Sugar Hill Invest. Assoc.*, 219 Ga.App. 781, 783–784, 466 S.E.2d 901 (1995); 62 C.J.S. *Municipal Corporations* § 201 (June 2004) ("Reasonable doubts as to the validity and legality of municipal action are to be resolved in its favor...."); 64 C.J.S. *Municipal Corporations* § 900 (June 2004).

**12.** It not only expressly declined to reach what constitutes the City's second ultra vires argument here, *see* 277 Ga. at 251, 588 S.E.2d 688, but also failed to reach the other ultra vires grounds (*i.e.*, the City's lack of express or implied authority) raised by the *CSX III* court. *See* 325 F.3d at 1246–49.

**13.** The *CSX IV* also did *not* address whether the City was otherwise barred from promising to indemnify CSX for SI torts when insurance in fact covers that liability.

ent officeholders unduly binding their successors, especially on fiscal matters; and (b) the creation of *de facto* monopolies and other civic ills. *See H.G. Brown,* 278 Ga. at 822, 607 S.E.2d 883 10 McQuillin Mun. Corp. § 29.100 (*Duration of contract*) (3rd ed. July 2004). The free legislation doctrine, for example, has been said to

> strike a balance in the public interest. On one side of the scale is the practical necessity of long range commitments and fair dealing by the governing authority with persons contracting with a municipality. On the other side is the necessity of a public policy dictating that one governing authority must not be allowed to impose a long term mortgage upon the taxable assets of a political subdivision without clear and valid enabling legislation.

*Brown v. City of East Point,* 246 Ga. 144, 146, 268 S.E.2d 912 (1980) (city council may not by ordinance bind its successors to make incremental pay raises to city employees); *Buckhorn Ventures, LLC v. Forsyth County,* 262 Ga.App. 299, 302, 585 S.E.2d 229 (2003). The doctrine has been applied to contracts and ordinances for counties and municipalities. *North,* 250 Ga.App. at 432, 551 S.E.2d 798.

But many arguably irreconcilable distinctions are found within the published opinions in this area. *See* R. Perry Sentell, *Local Government and Contracts that Bind,* 3 Ga.L.Rev. 546, 576–77 (Spring 1969); R. Perry Sentell, Jr., *The Georgia Supreme Court and Local Government Law: Two Sheets to the Wind,* 16 Ga.St. U.L.Rev. 361, 372–85 (1999); R. Perry Sentell, *Local Government Law,* 54 Mer. L.Rev. 417, 429 (Fall 2002).

The *CSX III* court addressed both of these doctrines but found Georgia law too unclear to resolve them. 325 F.3d at 1244–46. That court then expressly asked the *CSX IV* court for clarification, and also whether express or implied authority—

necessary for any city contract to be valid—supported the CSX–City contract even if it was not void on the "free legislation" and "unlawful debt" grounds. *Id.* at 1246. As mentioned *supra,* the *CSX IV* court did not address those issues. It did "decline CSX's invitation to find that municipalities have an implied authority to do what is expressly reserved to the legislature," *CSX IV,* 277 Ga. at 250, 588 S.E.2d 688, but it was speaking only of SI tort waiver at that point, *id.,* not the ultra vires doctrine. Nor did it acknowledge the contract's severability clause as illuminated by the *CSX III* court, 325 F.3d at 1243 n. 12.

Meanwhile, no clarifying Georgia opinion has been issued since *CSX III.* And under this Court's analysis, set forth in Part II(B) *supra,* addressing the City's second ultra vires argument (if not also the *CSX III* court's more fundamental ultra vires question) could moot most of the remaining issues here.

### D. Certification

This Court therefore will invoke Ga.Sup. Ct.R. 46, which now authorizes federal district courts to certify state law questions to the Georgia Supreme Court. After a thorough review of Georgia law, this Court finds that the following issues remain unsettled and unaddressed. It therefore certifies the following questions to the Georgia Supreme Court:

1. Could the City, with or without insurance, contract to indemnify CSX for losses *not* caused by the City but arising from its public works project (*i.e.,* where sovereign immunity does not apply)?

2. Could the City, with or without insurance, contract to indemnify CSX for non-SI tort losses *caused* by the City and arising from its public works project (*i.e.,* where sovereign immunity also does not apply)?

3. Did the City have authority to enter into an indemnification contract under which it promised to pay CSX, *with* insurance funds, for public project losses that the City *did* cause *and* for which sovereign immunity would otherwise apply (hence, for SI torts)?

4. Is any portion or the entirety of the CSX–City indemnity contract, in that it purports to cover all three of the above scenarios, otherwise ultra vires under the free-legislation or unlawful debt doctrines explained *supra?*

5. In that CSX seeks to show sovereign immunity waiver through the City's purchase of insurance, is GIRMA an indispensable party? If so, how should it be added?[14] *See supra* n. 10.

Neither the phrasing used in these questions, nor this Court's own analysis, should limit the Georgia Supreme Court's analysis or answers. To assist in its consideration of the questions, the Clerk shall transmit the entire record, along with the briefs of the parties, to the Supreme Court of Georgia.

### III. *CONCLUSION*

The motion (doc. # 122) of plaintiffs CSX Transportation, Inc. and National Railroad Passenger Corporation for partial summary judgment against defendant The City of Garden City (the City) is *DENIED* without prejudice to renew it post-certification. The motion (doc. # 126) of Garden City for summary judgment against the plaintiffs likewise is *DENIED* without prejudice, as is the motion (doc. # # 125,

138) of third-party defendant ARCO, Inc. for partial summary judgment. Plaintiffs' motion (doc. # 139) for leave to file a reply brief is *GRANTED.*[15]

Finally, this Court's above-stated questions are *CERTIFIED* to the Georgia Supreme Court. Until that court responds, all proceedings herein are *STAYED* and this case is administratively *CLOSED.*

---

**14.** In other words, for tort losses that the City *did* cause ("sovereign immunity torts," *see supra* n. 13), is GIRMA an indispensable party to an action that determines whether its policy covers such liability? *See supra* n. 10. If so, by what legal means would CSX add GIRMA? *Cf.* O.C.G.A. § 46–7–12(c) ("It shall be permissible under this article for any person having a cause of action arising under this [motor carrier] article to join in the same

action the motor common carrier or motor contract carrier and the insurance carrier, whether arising in tort or contract").

**15.** Such motions are no longer necessary. *See* S.D.Ga Loc.R. 7.5 & 7.6; *Podger v. Gulfstream Aerospace Corp.,* 212 F.R.D. 609, 609 (S.D.Ga.2003) ("parties may file as many reply briefs as they want").